# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **DENNIS JOE LYON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **1:18CV967** |
| **v.** | ) | **1:15CR416-3** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE</u>

Petitioner Dennis Joe Lyon, a federal prisoner, has brought a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Docket Entry 207.) Petitioner was convicted, after a jury trial, of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; fourteen counts of major fraud against the United States by obtaining money under false pretenses, in violation of 18 U.S.C. §§ 2, 1031(a)(2); and three counts of wire fraud, in violation of 18 U.S.C. §§ 2, 1343. (Docket Entries 60, 137, 176.) Petitioner was sentenced to 120 months of imprisonment, followed by three years of supervised release, and ordered to pay $4,030,577.42 in restitution and a $1,800 assessment. (Docket Entry 176.) His appeal was unsuccessful. *See United States v. Lyon*, 751 Fed. App'x 359 (4th Cir. 2018). Petitioner filed the instant motion (Docket Entry 207), a motion to supplement (Docket Entry 210),[1] a motion for release from custody (Docket Entry 214), a motion for the appointment of counsel (Docket Entry 217), and a motion entitled "Motion in Anticipatory Resistance" (Docket Entry

---

[1] The Court will grant Petitioner's motion to supplement (Docket Entry 210) and has considered all of Petitioner's pleadings and all of his arguments. None of these arguments has merit for the reasons set forth herein.

218). The Government responded to Petitioner's § 2255 motion (Docket Entry 219) and Petitioner, in turn, filed a reply (Docket Entry 222). The matter is now before the Court for a ruling. *See* Rule 8, Rules Governing Section 2255 Proceedings.

## FACTUAL BACKGROUND

The evidence at trial tended to show that:

### a. Introduction

The Veteran's Administration ("VA") hires contractors for construction projects at its facilities. By law and regulation, the VA must ordinarily obtain three surety bonds from the contractor to receive a VA contract: a bid bond (20% of the contract price), a performance bond (100% of the contract price), and a payment bond (100% of the contract price). (Docket Entry 185 at 36-37, 41.) The contractor must submit the bid bond with his contract bid and then provide the performance and payment bonds after he has been awarded the contract. (*Id.* at 36-37.) The bid bond guarantees that the surety will issue the performance and payment bonds if the contractor is awarded the contract. (*Id.* at 37.) The performance bond guarantees the VA that the surety will obtain a substitute contractor to finish the project if the original contractor fails to complete it. (*Id.*) The payment bond guarantees payment to the subcontractors and suppliers if the contractor fails to pay them. (*Id.*)

The VA normally relies on surety or insurance companies for its bonds, but it will sometimes accept an individual surety bond. (*Id.* at 39-40, 149.) The individual surety represents that he has pledged the assets listed in the bond and that he is acting as a personal guarantor. (*Id.*) The individual surety's assets have to be marketable, placed in an escrow

2

account, and segregated from other assets so they can only be applied to the contract. (*Id.*) The individual surety must submit an Affidavit of Individual Surety that identifies the surety, the contract, and the assets that are pledged to support the bid. (*Id.* at 42-43.)

After the VA awards a contract, the contractor submits to the VA contracting officer a monthly request for payment ("progress payment request") for work performed to date. (*Id.* at 32-33.) The contractor must certify that he has paid his subcontractors and submit a list of authorized subcontractors. (*Id.* at 33-35.)

### b. The Lyons' Businesses and Their Accomplices

Petitioner, Dennis Joe Lyon, and his brother, Frank Lyon ("Frank") (collectively "the Lyons"), operated Native American Funds Management Services ("NAFMS") and other surety bond companies in Albuquerque, New Mexico. (*Id.* at 127; Docket Entry 186 at 102-105, 132-141; Docket Entry 188 at 61.) Petitioner ran the office. (Docket Entry 188 at 61-63, 65.) Frank was a funds manager who also ran Contract Compliance, a company that was located in NAFMS's offices and which oversaw construction projects. (*Id.* at 63, 67, 75.) Petitioner's employees included Christina Barela ("Barela"), a secretary, Douglas Hilliard ("Hilliard"), an administrator, Joseph Bustos ("Bustos"), a funds manager, and Curtis Lombardi ("Lombardi"), an attorney. (Docket Entry 186 at 103, 105; Docket Entry 188 at 61, 86-87, 89, 106, 109.) In the late 2000s, Petitioner replaced Bustos with his daughter Melissa San Martin ("San Martin"). (Docket Entry 185 at 127; Docket Entry 188 at 117.)

The Lyons obtained escrow receipts to support their surety bonds from a business entity named Fondren. (Docket Entry 187 at 56-57.) Carter Green ("Carter Green" or

3

"Carter") ran Fondren; he was assisted by his daughter Stephanie Green ("Stephanie Green" or "Stephanie"), a college student who was 28 years old at the time. (*Id.* at 9-10, 140-141, 150, 156, 164.) Later, Carter changed the name of Fondren to Lincoln Reserve Group ("Lincoln Reserve" or "Lincoln"). (*Id.* at 9, 57.) In the late 2000s, Stephanie took control of Lincoln Reserve after Carter was imprisoned on unrelated charges. (*Id.* at 141-42.) She continued to contact Petitioner and Frank. (*Id.* at 143, 153.)

S.J. Construction, Inc. ("S.J. Construction"), was a small general contracting company based in Durham, North Carolina that was a client of the Lyons. (*Id.* at 66; Docket Entry 188 at 131.) Roger Stanfield ("Stanfield") was its president and Robin Jones was its vice-president. (Docket Entry 185 at 50.) Megan Jones, Robin Jones' daughter, was an office manager and Latarsha Nicholson ("Nicholson") was an account manager and liaison between S.J. Construction and the Lyons' companies. (*Id.* at 117-18; Docket Entry 187 at 65-69.)

### c. The Lyons Issue Worthless Surety Bonds

During the 2000s, Petitioner directed Hilliard to sign individual surety bonds with escrow receipts from Fondren and Lincoln Reserve, even though Hilliard was a salaried employee who did not have the assets to cover the amounts on the bonds. (Docket Entry 188 at 64-67, 75.) In 2005, Hilliard moved to Florida and worked for Petitioner on a part-time basis only. (*Id.* at 63-64, 69-70.) Petitioner then directed Bustos to sign the bonds for extra money, even though Bustos did not have the assets to cover the bonds. (*Id.* at 89, 92-101.) Bustos discussed his bond signing duties with Petitioner and Frank. (*Id.*) In the late 2000s,

Frank began using Bustos as a bond-signer instead of Petitioner. (*Id.* at 105.) Bustos signed approximately twenty bonds at Frank's direction. (*Id.*)

In 2007 and 2008, Hilliard and Bustos signed surety bonds to support a contract awarded to S.J. Construction by the Rocky Mount Housing Authority ("RMHA") in Rocky Mount, North Carolina. (*Id.* at 8-12, 72-77, 98-99; Docket Entry 187 at 252-253.) Fondren and Lincoln Reserve provided escrow receipts for those bonds. (Docket Entry 188 at 12, 15-19, 93, 98-100.)

In 2004, Petitioner hired Barela to be his secretary at $350 per week. (Docket Entry 186 at 102-103.) Barela was in her thirties, had a GED, and had previously worked as a secretary and bartender. (*Id.* at 98, 102.) Barela communicated with clients, including S.J. Construction, notarized surety bonds (including some blank bonds), signed checks for Petitioner, and delivered client mail to Frank. (*Id.* at 102-117, 140, 143, 147-149, 179.)

In 2007, Petitioner met Stephanie Green to discuss doing business with Lincoln Reserve after her father was imprisoned. (Docket Entry 187 at 143-149.) Petitioner told Stephanie that he had sufficient money to keep them in business and presented some bank documents to prove his point. (*Id.*) Petitioner also told her that he wanted Lincoln Reserve to continue to provide escrow receipts for his businesses, and that Petitioner's assets would back those receipts. (*Id.*) Stephanie believed that Lincoln was backed, at least in part, by certain mining claims. (*Id.* at 148, 152.) Stephanie, who was unfamiliar with the surety bond business, understood that Lincoln Reserve had to be independent from Petitioner's surety bond businesses. (*Id.* at 147.) She agreed to sign escrow receipts for Petitioner. (*Id.* at 149.)

5

Stephanie signed approximately 100 escrow receipts for Petitioner and Frank; she did not sign escrow receipts for anybody else. (*Id.* at 149-151, 156-157, 165, 177-179, 189-190.) Occasionally, she used false names on the escrow receipts. (*Id.* at 177, 200.) Frank did not direct her to do that, but he did tell her that he was glad that she was using another person's name on them. (*Id.* at 212.) Frank also told her to get a "virtual office" so that a Google search would show that she was operating from an office rather than her home. (*Id.* at 157, 193-196.) Frank also asked Stephanie to provide escrow receipts because they were in business together and a "family." (*Id.* at 150.) Finally, Frank told Stephanie that if she received a call about an escrow receipt, she should pass the information to him. (*Id.* at 151.) Finally, Frank and Barela both asked Stephanie to obtain an asset sheet for Lincoln Reserve. (*Id.* at 215-216.)

In the late 2000s, Petitioner asked Barela to sign four surety bonds with escrow receipts from Stephanie after educating Barela on the surety bond process. (Docket Entry 186 at 150-53, 157-58, 161-165.) Petitioner and Frank told Barela that she bore no risk in signing the bonds because Lincoln Reserve was bearing the risk. (*Id.* at 164-165.) When Barela asked Petitioner whether the contractors might target Lincoln Reserve instead of her, Petitioner reassured her that Lincoln Reserve was bearing the risk because it had the financial backing, and that she was only a bond signatory. (*Id.*)

### d. The VA Parking Deck Project

In 2008, the VA solicited bids to expand a parking deck at the VA hospital in Durham, North Carolina. S.J. Construction bid $6,559,620 on the project. (Docket Entry 185 at 44-48, 50, 86-87, 130-31, 140.) Petitioner contacted Stephanie Green to request an escrow receipt

6

from Lincoln Reserve for the VA project. (Docket Entry 187 at 153.) In early July, S.J. Construction submitted a bid bond that was 20% of the contract amount, an Affidavit of Individual Surety, and a $5,000,000 escrow receipt from Lincoln Reserve to the VA. (Docket Entry 185 at 50-58.) Robin Jones signed the bid bond as the principal, Barela signed the bid bond and the affidavit as the surety, and Stephanie signed the escrow receipt for Lincoln Reserve. (*Id.*)

On August 28, 2008, Teresa Holley ("Holley"), the VA contracting officer for the project, notified S.J. Construction that the bid bond was defective because the escrow receipt did not show that assets were pledged only for the VA project and a required signature was not notarized. (Docket Entry 185 at 62-64.) The next day, Nicholson emailed Barela about the defective bond. (Docket Entry 186 at 183-184; Docket Entry 187 at 73.) Barela forwarded that email to Petitioner. (Docket Entry 186 at 183-88; Docket Entry 187 at 73-74.) In reply, Petitioner said he did not see a fix to the problem, but he told Barela to forward the email to Frank to determine whether Frank wanted to continue to work on the project. (Docket Entry 186 at 185.) Frank told Barela that they would "move forward" on the project. (*Id.*)

Meanwhile, Robin Jones contacted Holley and obtained an extension to file an amended bid until September 8. (Docket Entry 185 at 65-67.) Lombardi also contacted the VA and stated that S.J. Construction would issue a new bid bond and that a third party would monitor the progress on the contract, receive the progress payments, and then distribute the payments to the subcontractors, suppliers, and the prime contractor. (*Id.* at 69-72.)

7

In early September 2008, Petitioner directed Barela to sign the new bid bond and to obtain an escrow receipt from Lincoln Reserve after promising her a $30,000 bonus. (Docket Entry 186 at 150-152, 158-160, 170.) After learning that Stephanie Green's signature had not been notarized, Frank and Petitioner directed Barela to notarize the signature even though Stephanie was not present. (*Id.* at 160-168, 178.)

Barela signed the bid bond and the Affidavit of Individual Surety. (*Id.* at 165.) On the bid bond, Barela falsely described herself as "semiretired" even though she was working as Petitioner's secretary for $500 per week. (*Id.* at 161, 168.) Further, she did not have assets to support the bond nor had she pledged any assets. (*Id.* at 169-170.) In addition, the bid bond falsely stated that Megan Jones had notarized Barela's signature on the bond. (*Id.* at 167, 178.)

On September 8, at Petitioner's direction, Barela asked Stephanie Green for a $1,320,000 escrow receipt from Lincoln Reserve and asked Stephanie to call her or Frank because Frank was responsible for making sure that the surety bonds were sent to the contractors. (*Id.* at 158-159, 173-175.) The next day, by email with a copy to Frank, Stephanie sent the requested escrow receipt to Barela. (*Id.* at 176-177; Docket Entry 187 at 153-156.)

On September 8, S.J. Construction submitted the new bid bond, Affidavit of Individual Surety, and escrow receipt to the VA. (Docket Entry 185 at 72, 74, 79-81; Docket Entry 186 at 165-167.) Robin Jones signed the bid bond for S.J. Construction. (Docket Entry 185 at 76.) Barela signed the bid bond and affidavit as the surety and Stephanie Green signed the escrow receipt for Lincoln Reserve. (*Id.* at 76-79.) The escrow receipt stated that Contract Compliance

8

would certify any losses and that all fees for services rendered by Lincoln Reserve would be paid by a funds manager. (*Id.* at 80-81.)

On October 31, 2008, the VA awarded the parking deck contract for $6,559,620 to S.J. Construction based in part on the bid bond. (*Id.* at 47-48, 82-83.) Afterwards, Petitioner told Barela to prepare the required performance and payment bonds for S.J. Construction. (Docket Entry 186 at 193.) On November 7, Nicholson faxed a copy of the award to Frank and told him that she needed the performance and payment bonds soon. (Docket Entry 187 at 88-91.)

On November 20, S.J. Construction submitted those bonds to the VA. (Docket Entry 185 at 87, 89, 98, 100-102.) Like the bid bond, Robin Jones signed the performance and payment bonds for S.J. Construction; Barela signed the bonds and the Affidavit of Individual Surety as the surety; and Stephanie Green signed the escrow receipts for Lincoln Reserve. (*Id.* at 100-109.) Barela had "zero" assets to apply to the escrow account and she did not actually pledge assets. (Docket Entry 186 at 198-199.) In addition, S.J. Construction submitted an assignment of claim provision that effectively allowed NAFMS to receive the progress payments from the VA. (Docket Entry 185 at 126-130, 217-221; Docket Entry 186 at 45-46; Docket Entry 187 at 94.) San Martin was designated as the liaison between NAFMS and the VA. (Docket Entry 185 at 127-128, 213.)

On December 3, 2008, Holley gave S.J. Construction notice to proceed with the project after concluding that the bonds were valid. The contract required the project to be completed by July 11, 2009. (*Id.* at 123-124.) In late 2008, Petitioner moved to Nevada but he continued

9

to run the New Mexico office and Frank continued to work there. (Docket Entry 186 at 204-205.) At the end of 2008, or in early 2009, Barela stopped working for Petitioner to open up her own surety bond business with Frank. (*Id.* at 205-214.)

On December 31, 2008, in an email to Petitioner with a copy to Frank, Barela asked Petitioner for an additional $5,000 for the VA project. (*Id.* at 206-209.) In response, Petitioner promised her a "bigger portion of the S.J. check." (*Id.* at 209.) Petitioner wrote a $5,059.62 check from his NAFMS account to Barela with the term "SJ/VA Garage" on the memo line. (*Id.* at 211-212.) The VA approved sixteen progress payment requests to S.J. Construction from January 2009 to February 2011 based on the certifications of proper payment from Robin Jones. (Docket Entry 185 at 131-132, 140, 145, 217-220.)

On January 27, 2009, S.J. Construction submitted its first progress payment to the VA for more than $400,000 that included an invoice for $360,801.96 from NAFMS for "bonding." (*Id.* at 130-142.) Robin Jones signed the certification for S.J. Construction even though there were no legitimate bonding fees. (*Id.*) The VA approved the payment. (*Id.* at 143.) Because that payment sought 100% of the bond costs, future payments would not have been warranted for bonds or monitoring. (*Id.* at 134-135.) The VA sent the payment to S.J. Construction's bank account. (Docket Entry 188 at 129-131, 133.) In March, S.J. Construction wired $360,574.33 to a NAMFS bank account controlled by Petitioner. (*Id.*) In April, the VA approved a second progress payment for $268,020. The VA sent the payment to S.J. Construction, which wired the funds to another NAFMS bank account controlled by Petitioner. (Docket Entry 185 at 143-144; Docket Entry 188 at 136-139.)

10

The VA project ran into financial trouble. Charles King, a project manager with S.J. Construction, believed that S.J. Construction underbid the VA parking deck project, and did not have enough manpower to complete it. Soil issues and bad weather contributed to delays. (Docket Entry 185 at 210; Docket Entry 187 at 108-09, 115-116, 126.) In addition, S.J. Construction stopped paying its employees and other workers. (*See, e.g.*, *id.* at 116-120.)

In March 2009, Brian Souter ("Souter") replaced Holley as the VA officer overseeing the VA project. (Docket Entry 185 at 202-203.) After learning of the problems at the worksite, Souter notified Contract Compliance and NAFMS about those problems on Contract Compliance's inspection reports, but neither entity responded to his inquiries. (*Id.* at 206-214.) On occasion, San Martin contacted Souter about payments to the project's subcontractors. (*Id.* at 213; Docket Entry 186 at 32-33.) Souter approved fourteen additional progress payment requests, but he did not authorize any payment transfers to NAFMS, to Lincoln Reserve, or to S.P. Construction. (Docket Entry 185 at 216-220, 224; Docket Entry 186 at 46, 54.) Although the VA's first two progress payments were paid directly to S.J. Construction, the remaining payments were wired to Petitioner's accounts. (Docket Entry 186 at 8-10; Docket Entry 188 at 128-131, 133, 150-151, 158-159; Docket Entry 185 at 216-225.)

As the problems with the project mounted, Souter sent certified letters describing those problems to Barela and to Lincoln Reserve, but he received no reply. (Docket Entry 185 at 224-226.) In June 2010, Souter stopped the VA project temporarily after discovering that S.J. Construction lacked liability insurance. (*Id.* at 214.) In November, after S.J. Construction was unable to obtain the required insurance, Souter terminated the VA parking deck contract for

11

default and notified S.J. Construction, Barela, and Lincoln Reserve of his action. (*Id.* at 216, 224-226; Docket Entry 186 at 11-20.) By letter, Souter notified Barela and Lincoln Reserve that the VA would file a claim against the surety due to the termination of the VA parking deck contract. Souter also attempted to call Lincoln Reserve. (Docket Entry 186 at 15-17.) Souter received no replies. (*Id.* at 15-22.) At the time of the termination of the contract, the parking deck project was 75% to 80% complete. (*Id.* at 22.) The VA had paid $5,126,306 on the contract; the remaining balance was approximately $2,000,000. (*Id.* at 22-23.) The VA hired Gulf Tech Construction to finish the job for $4,578,000. (*Id.* at 24-27.)

In October 2010, Carolyn Wilson ("Wilson"), a subcontractor for the VA parking deck project, contacted San Martin about her failure to be paid for her work. (*Id.* at 55, 62-67.) San Martin referred her to "Joe." Wilson emailed "Joe" and talked to him about her problem, but it was never resolved. (*Id.*) Later, Wilson contacted Robin Jones, who advised her to contact Frank. (*Id.* at 71-74.) Wilson tried to call Frank, but either nobody answered her calls or she received a message stating that that number did not take incoming calls. (*Id.* at 72-73.) Wilson was unable to contact Barela or Lincoln Reserve. (*Id.* at 77.)

### e. The Lyons Divert VA Money

From 2008 to 2011, Petitioner wrote numerous checks from his NAFMS or FMS Marianas bank accounts to his relatives and associates for the VA parking deck project. In 2008, Petitioner wrote a $2,500 check to Frank and a $7,000 check to himself as the job producer. (Docket Entry 188 at 145.) Petitioner also wrote a $1,500 check to Barela. (Docket Entry 186 at 201-203.) In January and February of 2009, Petitioner wrote a $7,000 check and

a $25,798.10 check to Lombardi. (Docket Entry 188 at 146-47.) On February 20, 2009, Petitioner wrote a $25,798.10 check to Contract Compliance that was deposited in a bank account controlled by Frank, and a $5,059.62 check to Barela. (*Id.* at 148, 172-173; Docket Entry 186 at 211-212.) On March 12, 2009, Petitioner wrote a $32,798.10 check to Lincoln Reserve as a "premium" for that project. Petitioner and Frank told Stephanie Green that she could use the money for her father's legal expenses. (Docket Entry 187 at 211; Docket Entry 188 at 148-149.) Petitioner paid Barela $6,700 for the VA bond signings. (Docket Entry 186 at 161.) In 2010 and 2011, Petitioner also wrote checks to S.P. Construction, a company controlled by Stanfield that was not authorized payment under the VA contract. (Docket Entry 185 at 223-224; Docket Entry 188 at 153, 162-163, 169, 174-175.) Barela received some letters informing her that the VA project was going poorly. (Docket Entry 186 at 218-220.) Barela either faxed the letters to, or discussed them with, Frank. (*Id.*) Frank told her that he would take care of it after he contacted Lombardi. (*Id.*)

### f. Additional Evidence under Rule 404(b)

The Government also sought to present evidence under Fed. R. Evid. 404(b) of a bond scheme involving the RMHA. (Docket Entry 120.) At trial, over the objection of the defense, the Court admitted the evidence to show the Lyons' knowledge and intent under Rule 404(b) of the Federal Rules of Evidence, and the extent of the "criminal operations." (Docket Entry 186 at 118-130.) The Court also ruled that that evidence was not unduly prejudicial under Rule 403. (*Id.* at 130.)

13

The Government presented evidence of the RMHA bond scheme through the testimony of Barela, Hilliard, Bustos, Stephanie Green and RMHA chief Larry Russell ("Russell"). That evidence established that in May 2007, the RMHA contracted with S.J. Construction to develop two public housing projects, the Weeks-Armstrong project and the Beal Street project. Robin Jones represented S.J. Construction on those projects. (Docket Entry 187 at 236-244.) S.J. Construction submitted a bid bond, a performance bond, and a payment bond to support those contracts. (*Id.*) Ultimately, S.J. Construction did not complete either project. (*Id.* at 243-244.)

On May 8, 2007, Hilliard signed the Affidavit of Individual Surety for the Weeks-Armstrong project, after falsely describing himself as semi-retired at Petitioner's suggestion. Barela notarized Hilliard's signature. Carter Green signed an accompanying escrow receipt from Fondren. (Docket Entry 188 at 17-19; 75-77.) Hilliard also signed the Affidavit of Individual Surety for the Beal Street project, which also falsely described him as being semi-retired. (Docket Entry 187 at 252; Docket Entry 188 at 10-13.) Carter signed the accompanying escrow receipt from Fondren. (Docket Entry 188 at 10-13.) The receipt stated that Contract Compliance would certify all losses. (*Id.*)

On January 14, 2008, at Frank's direction, Bustos signed the $316,000 performance and payment bonds and the Affidavit of Individual Surety for the Beal Street project. (Docket Entry 187 at 245-253; Docket Entry 188 at 96-101.) Bustos falsely described himself as being semi-retired. (Docket Entry 188 at 99.) Barela notarized Bustos' signature on the affidavit. (*Id.* at 100.) Carter Green signed the accompanying escrow receipt from Lincoln Reserve. (Docket

14

Entry 187 at 248-249.) The receipt stated that Contract Compliance would certify all losses. (*Id.*) Robin Jones signed the bonds for S.J. Construction. (*Id.* at 246, 248, 250-251.)

In 2009, Russell notified Frank at Contract Compliance that there were problems at the projects, including a failure to pay subcontractors, and directed Frank to fix them. (Docket Entry 188 at 19-23.) Russell sent copies of his letter to Bustos and others. (*Id.*) As the problems at the sites intensified, Russell tried to communicate with Petitioner, San Martin, and Robin Jones based on contact information supplied by Nicholson. (*Id.* at 24-34.) Russell got no help from them, or from Lincoln or Fondren. (*Id.*) Ultimately, RMHA cancelled the contracts with S.J. Construction and hired other contractors to finish the projects. (*Id.* at 33-34.)

During Russell's testimony, the Court instructed the jury that the RMHA bond scheme evidence was admitted to show the defendants' state of mind, intent, plan, preparation, or if they committed the charged offenses by mistake or accident. (*Id.* at 10.) The Court repeated those limiting instructions during its final charge to the jury. (Docket Entry 196 at 121-122.)

### g. The Trial Evidence

The Government's case against the Lyons consisted primarily of the testimony of Barela, Stephanie Green, Nicholson, Hilliard, Bustos, Holley, and Souter, and the testimony of several unpaid workers at the parking deck project. The bonds, checks and relevant documents were also admitted into evidence. Petitioner did not testify or present any evidence. In closing argument, counsel denied an intent to defraud. (Docket Entry 196 at 70-90.)

**h. The Appeal**

On appeal, Petitioner challenged the Court's admission of evidence regarding the two prior surety fraud schemes. *Lyon*, 751 Fed. App'x at 361. The Court rejected the arguments, concluding that:

> that the district court did not abuse its discretion in admitting at trial evidence concerning the prior fraud schemes. The evidence was relevant, as it showed the Lyons' modus operandi, including that Dennis Joe Lyon recruited others and directed them to sign fraudulent bonds, affidavits of individual surety, and escrow receipts in order to obtain construction contracts and that Daniel Frank Lyon falsely certified compliance with the contracts in order to obtain progress payments. Indeed, the prior fraud evidence was particularly probative because it rebutted the Lyons' claim that their codefendants orchestrated the fraud scheme instead of them. Finally, we conclude that the probative value of the prior fraud evidence outweighs its prejudicial nature, particularly in light of the district court's limiting instructions.

*Id.* at 362.

The Fourth Circuit also rejected a sufficiency of the evidence argument:

> The Lyons contend that, without the admission of the Rule 404(b) evidence pertaining to their prior fraud schemes, the evidence submitted at trial tended to support a finding that certain codefendants perpetrated the fraud scheme alone, without the help of Dennis Joe Lyon. However, because we conclude that the evidence of prior fraud schemes was properly admitted—particularly in light of the evidence's tendency to show Dennis Joe Lyon's recruitment and direction of the various codefendants—this argument is unavailing. Furthermore, even without the evidence of the prior fraud schemes, we consider the evidence presented at trial sufficient to allow the jury to conclude that Dennis Joe Lyon recruited his codefendants and directed them to prepare the worthless bonds, affidavits of individual surety, and escrow receipts. *See* 18 U.S.C. § 1301(a) (providing elements of major fraud); *United States v. Burfoot*, 899 F.3d 326, 334–35 (4th Cir. 2018) (stating elements

16

of wire fraud); *United States v. Landersman*, 886 F.3d 393, 406 (4th Cir. 2018) (stating elements of § 371 conspiracy).

*Id.*

The Fourth Circuit also rejected Petitioner's challenge to the four-level sentencing enhancement he received for being an organizer or leader of a criminal activity:

> We conclude that the district court did not clearly err in applying the § 3B1.1(a) role adjustment. The evidence established that Dennis Joe Lyon ran the bond company central to the fraud scheme and that, in that capacity, he assigned specific roles to his employees in relation to the scheme. Furthermore, as explained above, the properly admitted evidence of prior fraud schemes undermined Dennis Joe Lyon's assertion that his codefendants acted without his direction.

*Id.* at 363.

## PETITIONER'S GROUNDS

Petitioner's § 2255 motion raises three grounds for relief and numerous sub-grounds. First, Petitioner asserts "[i]neffective assistance of counsel based on counsel's failure to prepare for trial; counsel's failure to investigate the facts of the case and the underlying authority; counsel's failure to subpoena documents and witnesses; counsel's failure to prepare defendant to testify and counsel's failure to communicate with defendant." (Docket Entry 207, Ground One.) Second, Petitioner asserts "[p]rosecutorial misconduct based on prosecutor's failure to turn over exculpatory evidence and the deliberate use of invalid and erroneous evidence designed to confuse and deceive the jury." (*Id.*, Ground Two.) Third, Petitioner asserts "[i]neffective assistance of counsel for failing to object to the multitude of errors in the

17

pre-sentence report." (*Id.*, Ground Three.) As explained below, Petitioner's motion warrants no relief.[2]

## DISCUSSION

In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668, 688, 691-92 (1984). A petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). To establish prejudice, a petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Claims of ineffective assistance of counsel on appeal are also judged using the *Strickland* test. *See Lawrence v. Branker*, 517 F.3d 700, 708-09 (4th Cir. 2008). Appellate counsel need not raise on appeal every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983); *see also Evans v. Thompson*, 881 F.2d 117, 124 (4th Cir. 1989) (declaring that counsel pursued sound strategy when he "determined what he believed to be petitioner's most viable arguments and raised them on appeal"). Ineffective assistance of appellate counsel can be shown by demonstrating that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Bell v. Jarvis*, 236 F.3d 149, 180 (4th Cir. 2000) (citation omitted).

---

[2] Petitioner's pleadings are voluminous. The pleadings, at times, are also difficult to follow. The undersigned has attempted to respond to all of the many variations of Petitioner's grounds and sub-grounds for relief. To the extent that any have not been specifically discussed, they should still be denied for essentially the same reasons set out herein.

18

## Ground One

Petitioner first asserts "[i]neffective assistance of counsel based on counsel's failure to prepare for trial; counsel's failure to investigate the facts of the case and the underlying authority; counsel's failure to subpoena documents and witnesses; counsel's failure to prepare defendant to testify and counsel's failure to communicate with defendant." (Docket Entry 207, Ground One.) As articulated, these arguments are vague, conclusory, and unsupported and fail for this reason alone. *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir.1992), *abrog'n on other grounds recog'd*, *Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999). And, as explained below, even taking into consideration Petitioner's additional arguments and supporting documents, this ground has no merit.[3]

For example, Petitioner first faults counsel for failing to marshal in his defense evidence of his "legitimate bonding business" and that this "was a crucial element missing from the trial that would have shown the jury that [Petitioner] was a legitimate business owner." (Docket

---

[3] Although a number of Petitioner's grounds for relief assert ineffective assistance of counsel and prosecutorial misconduct, he frequently lapses into attacks on the sufficiency of the evidence used to convict him at trial. (*See, e.g.*, Docket Entry 207 at pdf page 38 ("The Government's case is built on the false premise that Movant issued a bogus surety bond. This is not supported by the facts or the testimony of Government witnesses.").) Nevertheless, any such arguments fail as a matter of law. This is because Petitioner challenged the sufficiency of the evidence on appeal and the Fourth Circuit rejected this argument. Specifically, as noted, the Fourth Circuit concluded that "the evidence presented at trial [was] sufficient to allow the jury to conclude that Dennis Joe Lyon recruited his codefendants and directed them to prepare the worthless bonds, affidavits of individual surety, and escrow receipts." *Lyon*, 751 Fed. App'x at 361. Petitioner cannot raise anew issues decided on their merits by the Fourth Circuit. *See Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976). Moreover, even if this Court could decide this issue de novo, it would reach the same conclusion as the Fourth Circuit.

Entry 207 at pdf page 22.)[4] This argument appears to be an assertion that Petitioner issued other surety bonds related to other projects that were not fraudulent. However, even assuming this to be the case, and even assuming such evidence had been introduced at trial, there is no meaningful reason to believe that the jury would have reached a different outcome here, in this case, on these facts and these charges. This argument, which Petitioner reiterates throughout his voluminous pleadings, has no merit in any of its permutations.[5]

Petitioner also appears to fault counsel for failing to argue at trial (1) that Lincoln Reserve escrow receipts did not require the actual posting of funds and (2) that Petitioner believed the escrow company in this case had a "conservative" balance of $270,000,000,000 in non-cash assets based on a purported mining claim. (Docket Entry 207 at pdf page 24.) However, the evidence at trial, described in detail at the outset of this Recommendation, supports the conclusion that Petitioner and his brother provided, by directing others, false surety bonds and false escrow receipts and that this induced the VA to award S.J. Construction a contract. Petitioner has not pointed to any evidence that, had it been introduced at trial, was likely to have undermined this conclusion. And, beyond this, Petitioner's counsel did argue at

---

[4] Page citations for Docket Entries 207 and 210 come from its CM/ECF footer, not Petitioner's pagination.

[5] In making this argument, Petitioner also asserts that "Email correspondence, withheld by the Government and never requested by defense counsel, will show that Movant requested an audit from Lincoln." (Docket Entry 207 at pdf page 23.) If this is an additional argument, it fails for being vague, conclusory, and unsupported. *See Nickerson*, 971 F.2d at 1136. And, even taking Petitioner's assertion as true, he has failed to demonstrate that he was prejudiced in any meaningful manner by this omission. Last, had Petitioner taken the stand at his trial and testified to this effect, he would likely have been subject to a vigorous cross-examination by the Government that would not have aided his defense.

trial along the general lines Petitioner now advances, albeit without success. (Docket Entry 196 at 65-66; Docket Entry 185 at 157-165.)

Along similar lines, Petitioner further contends that counsel was ineffective for failing to demonstrate at trial that Petitioner did his due diligence and had determined that Fondren and Lincoln were financially sound entities. (Docket Entry 207 at pdf pages 23-24.) Nevertheless, the evidence at trial, also described in detail above, was that Fondren and Lincoln were not financially sound and that Petitioner knew this. Petitioner has not pointed to any evidence that, had it been introduced at trial, was likely to have undermined this conclusion.[6] And, beyond this, counsel argued unsuccessfully at trial that Petitioner had no involvement with Lincoln or Fondren and that Petitioner reasonably believed they were sound financial institutions. (Docket Entry 196 at 65-66.) This argument is also without merit.

Petitioner also faults counsel for failing to demonstrate at trial that "the VA is responsible for the bungled project, based on their own incompetence." (Docket Entry 207 at pdf page 25; *see also id.* at pdf pages 25-28.) Petitioner contends too that had the VA done a minimal amount of due diligence regarding Lincoln Reserve, it would have learned that "it was owned and operated by a college student, using her apartment as an office with no staff and

---

[6] Petitioner's brief also contains numerous material misstatements of the record. For example, Petitioner asserts that "Green testified that she called the geologists to confirm the gold mine claim" that ostensibly backed Lincoln Reserve, but the record reveals no such trial testimony. (Docket Entry 207 at pdf page 28 referencing Docket Entry 187 at 184-188.) Petitioner also asserts that "Barela testified that Movant was living in Las Vegas and was not involved in the VA Bond." (Docket Entry 207 at pdf page 34 referencing Docket Entry 187 at 5-8.) This is also false. Barela instead testified that Petitioner paid her to sign bonds related to the VA project. (Docket Entry 186 at 150-193.) Petitioner's briefing exceeds 100 pages and so the Court will not stop to point out each of Petitioner's mischaracterizations of the record other than to observe that, as a general matter, that they do not strengthen his grounds for relief or undermine his fraud conviction.

21

no verifiable bank accounts or assets." (*Id.* at 26.) Petitioner likewise faults counsel for failing to challenge the VA contracting officer Holley's testimony at trial and demonstrate that she "had a reason to lie so that blame could be shifted from her" to Petitioner. (*Id.* at 27.) Petitioner likewise faults counsel for failing to cross-examine Holley and show that she failed to do her due diligence as to Barela. (Docket Entry 207 at pdf page 25.) Nevertheless, Petitioner's efforts to shift responsibility for his criminal activity to the VA are immaterial, unconvincing, and contradicted by the record. This is because it is Petitioner, not the VA contracting officer, that was charged with, and convicted of, criminal fraud. Beyond this, counsel did cross-examine contracting officer Holley in an effort to demonstrate that the VA had failed to do its due diligence. (Docket Entry 185 at 148-178.) There is no reason to believe that additional efforts in this regard would have changed the outcome at trial. This argument also fails.

Petitioner next contends that counsel "failed to investigate the facts of the case and interview witnesses in order to prepare a proper defense. Movant provided a multitude of documents to defense counsel that could have been used as exhibits in the trial. This material was ignored by defense counsel." (Docket Entry 207 at pdf pages 28-29.) Elsewhere, Petitioner describes this as documentation "which constituted over 10,000 pages of evidence[.]" (Docket Entry 222 at 1.) This argument fails for a number of reasons. First, counsel (David B. Freeman), by way of affidavit, states that he, and/or an associate in his office (Tim Stewart, who helped prepare and try the case), reviewed all of the documents Petitioner provided, but that he did not see a way to make use of any of them. (Docket Entry 219, Attach. C at 1.) Second, the Court has reviewed all of the documents Petitioner has submitted in support of

the instant motion and fails to see how their omission from trial prejudiced Petitioner. The undersigned notes too that it seems exceedingly unlikely that the trial court would have permitted Petitioner's counsel to admit in excess of 10,000 pages into evidence at trial. Third, as explained in greater detail below, Petitioner's testimony at trial in an effort to lay a foundation for the introduction of evidence was unlikely to have been helpful. Beyond this, Petitioner argues that counsel could have introduced evidence of other surety bonds that Petitioner had issued that were legitimate and thus countered "the Government's narrative that [Petitioner's] enterprise was one large fraudulent operation." (Docket Entry 207 at pdf page 29.) However, as explained, the fact that Petitioner may have conducted legitimate surety bonding in other instances is immaterial to Petitioner's conduct in this case. Counsel's failure to pursue the tactics at trial that Petitioner now advances was neither objectively unreasonable nor prejudicial to Petitioner.

Petitioner also faults counsel for not calling "a number of witnesses whose testimony would have impeached several of the Government's witnesses in addition to showing that [Petitioner] was no longer issuing surety bonds at the time the VA bond was issued." (*Id.* at 30.) These witnesses include: Melissa San Martin, Anthony Garduno, and Ben Zvenia. (*Id.*) However, Petitioner has failed to include an affidavit from any of these individuals supporting this otherwise conclusory assertion. Unsupported, conclusory allegations do not entitle Petitioner to even a hearing, much less to the sort of relief sought here. *See Nickerson*, 971 F.2d at 1136. Beyond this, given the considerable evidence arrayed against Petitioner at trial, there

is no reason to believe that even had these individuals testified along the lines Petitioner suggests, this case would have turned out differently.

Petitioner also faults counsel for not calling him to testify at trial. (*Id.* at 31-32.) However, counsel had good reasons for advising Petitioner not to testify at trial. Had Petitioner taken the stand, the jury likely would have become aware that he was subject to numerous cease and desist orders from various states preventing him from engaging in fraudulent activity. (Docket Entry 219, Attach. C at 1-2; Docket Entry 148, ¶ 26.) Moreover, the jury likely would have learned that Petitioner had used numerous names in his different business transactions, which may have been difficult to defend. (*Id.*) Beyond this, during the trial, efforts were made to serve a civil judgment in excess of five million dollars against Petitioner for issuing fraudulent performance bonds to guaranty construction work on a school in New Mexico. (Docket Entry 219, Attach. C at 2.) Had Petitioner testified, all of this information would have likely been presented to the jury and none of this information was likely to have helped him.[7] Beyond this, the Court spoke with Petitioner, informed him that while he had a right to remain silent, he also had an "absolute right to testify" and told him that "[n]o one can stop you" from testifying. (Docket Entry 188 at 211.) Petitioner indicated that he understood and had no questions. (*Id.*) The record indicates that not only did counsel

---

[7] For this reason, any efforts by Petitioner to fault counsel for failing to gather and introduce at trial business records that only Petitioner could authenticate also fails. Had Petitioner taken the stand, he would have been subject to damaging cross-examination. This supports counsel's decision to forgo introducing evidence at trial and instead to challenge the Government's case. (Docket Entry 219, Attach. C at 1-2.)

make a reasonable tactical decision in not calling Petitioner to testify, but also that Petitioner agreed with this decision. This argument is without merit.[8]

Petitioner next faults counsel for "refus[ing] to subpoena exculpatory material despite [his] repeated requests" including correspondence between Stephanie Green and Barela and correspondence from Russell, the contracting officer at RMHA, "that would have shown that the surety bond issued by [Petitioner's] firm on the Weeks RMHA project was valid and proper." (Docket Entry 207 at pdf pages 31-32.) The problem here, though, is that Petitioner has failed to point to the existence of any exculpatory evidence and, as noted, conclusory arguments fail as a matter of law. *See Nickerson*, 971 F.2d at 1136. And, as noted, had Petitioner testified in an effort to explain the purportedly innocent nature of various business documents, he likely would have done more harm to his case than good.[9]

Petitioner also faults counsel for failing "to establish a time line evidencing the fact that [he] was no longer working with Barela and Bustos in Albuquerque, New Mexico when Barela

---

[8] Along similar lines, Petitioner also asserts that "[t]he record reflects the fact that defense counsel did not provide a defense." (Docket Entry 207 at pdf page 31.) This is not so. Counsel successfully sought the dismissal of one of the charges against Petitioner. (Minute Entry 12/19/2016; Docket Entry 183 at 2-3, 5.) As explained, counsel also made a rational decision to advise Petitioner not to testify at trial and to instead challenge the Government's case, which counsel proceeded to do throughout the course of the trial. (*See, e.g.*, Docket Entry 185 at 148-178; Docket Entry 186 at 29-41, 51-53, 79-91; Docket Entry 187 at 5-27, 59-62, 93-102, 107, 121-128, 179-208, 225-229.) Beyond this, Petitioner has failed to submit any evidence or additional argumentation that counsel could have raised at trial or sentencing or on appeal that was likely to have changed the outcome here.

[9] In a different pleading, Petitioner admits that, "Defense Counsel told Petitioner that he would need someone on the witness stand to verify the documents to get them entered as evidence and to validate their authenticity." (Docket Entry 217 at 3.) As explained, had Petitioner testified, he likely would have been subjected to cross-examination that would not have aided his case.

issued the surety bond for the VA project in Durham, North Carolina." (Docket Entry 207 at pdf page 32.) However, there is no reason to believe counsel could have done this, especially without Petitioner's testimony, which, as explained, was unlikely to have helped his case. Barela testified that she worked for Petitioner from 2004 until late 2008 or early 2009 and this was supported by email correspondence between Barela and Petitioner supporting the same conclusion. (Docket Entry 158 at 7-9, 111-117.) Barela further testified that Petitioner asked her to sign the bonds for the VA parking deck project with S.J. Construction, in return for payment, which she proceeded to do.[10] (*Id.* at 56, 98-104.)

This testimony also finds additional support in the record. By way of nonexclusive example, in late 2008 and early 2009 Petitioner and Barela exchanged emails in which Petitioner agreed to sending Barela "the bigger portion of the S.J. check." (*Id.* at 113-114.) And, at trial, the Government introduced an email chain from late August 2008, in which Petitioner directed Barela to speak to Frank, "and see if he wants to work on this or you or Curtis or me. The VA really wants them on the job, so we have this on our side." (*Id.* at 88-90.) Beyond this, Petitioner has failed to point to any evidence which, had it been admitted,

---

[10] Petitioner also contends that he was traveling overseas during part of the relevant period and that, as a result, he could not have been present when the VA bonds were signed. (Docket Entry 210 at pdf page 62; Docket Entry 222 at 7.) In support, he has submitted an email dated November 11, 2008 in which he tells another individual he is "going to [M]anila and [S]aipan this evening and will be back between the 18th and 22nd." (Docket Entry 210, Attach. 5 at pdf page 68 (Ex. 43).) Petitioner has not provided evidence that he actually went on the trip referenced in the email, or if he did, how long he traveled. And, even if Petitioner had traveled as alleged, such travel would not demonstrate his innocence in light of the time-line set out in the factual background set forth above. Moreover, Petitioner need not have been actually physically present at each fraudulent act to be guilty of criminal fraud, especially where he recruited proxies to act on his behalf. Counsel did not err at trial or on appeal by not raising this meritless claim.

26

was likely to have changed the outcome at trial. Petitioner's contentions (Docket Entry 207 at pdf pages 36-37) that counsel somehow "failed" to demonstrate that he had nothing to do with issuing bonds related to the VA project; that Barela, Stephanie Green, and Bustos were solely responsible for issuing the fraudulent VA bonds; or that he no longer worked with Barela during the relevant period are without merit.

Petitioner also faults counsel for not asking "Green how the Government can hold [Petitioner] responsible for Lincoln's lack of financial capacity" and for not questioning Barela about additional documentation Petitioner has attached to his motion. (Docket Entry 207 at pdf pages 35-38.) Stephanie Green was a fact witness, however, and questions to her about the Government's theory of liability, in addition to being improper and objectionable, would have been beyond her purview. Beyond this, counsel vigorously cross-examined Stephanie Green and Barela and Petitioner has failed to demonstrate that any of the additional lines of inquiry he now proposes had any chance of altering the outcome of the trial.[11] (Docket Entry 187 at 5-27, 179-208.)

Petitioner also contends that counsel "should have shown that [Petitioner] was involved in the Weeks project,[12] but not the Beale Street project" and that counsel confused

---

[11] In his supplement, Petitioner repeatedly faults counsel for failing to cross-examine various witnesses in greater detail and for failing to introduce at trial or sentencing various documents and evidence. (*See, e.g.*, Docket Entry 210 at pdf pages 3-37.) However, Petitioner has failed to demonstrate any prejudice resulting from these purported omissions. And, as explained, had Petitioner testified at trial to lay a foundation for the admission or authenticity of any of these documents, he would have likely harmed his own defense. None of these arguments is persuasive.

[12] Petitioner faults counsel for not establishing that he "properly supported the bond on the Weeks project" and for not showing that Petitioner "had no involvement in the Beal Street project"

27

the two projects both at trial and on appeal. (Docket Entry 207 at pdf pages 41-42.) However, the evidence at trial indicated that Petitioner was involved in the Beal project. For example, evidence at trial indicated that Petitioner directed Hilliard to sign individual surety bonds with escrow receipts from Fondren and Lincoln Reserve, even though Hilliard was a salaried employee who did not have the assets to cover the amounts on the bonds. (Docket Entry 188 at 64-67, 74-75.) Evidence at trial further indicated that Hilliard signed the Affidavit of Individual Surety for the Beal Street project and that it falsely described him as being semi-retired. (Docket Entry 187 at 252-253; Docket Entry 188 at 10-13, 64-67, 76-77.) Beyond this, Petitioner's conclusory assertion that trial and appellate counsel, as well as the Government, confused these projects is not supported by the record.

Petitioner also asserts that counsel was ineffective for not showing the jury that "[t]he original bid bond on the Weeks project was rejected by RMHA" and that he "financially supported the accepted bond for the Weeks project" because he deposited more than one million dollars in Compass Bank and most of that was used to pay out losses for S.J. Construction's default on that project. (Docket Entry 207 at at pdf page 40.) In fact, Petitioner repeats this argument throughout his pleadings. (Docket Entry 210 at pdf pages 58-61; Docket Entry 222 at 4-5.)

Nevertheless, evidence at trial indicated that Hilliard—a salaried employee who did not have the assets to cover the amounts on the bonds—executed a surety agreement related to

---

(Docket Entry 207 at pdf page 41), however, Petitioner fails to point to evidence that would support such a conclusion.

the Weeks project describing himself as semi-retired at Petitioner's suggestion, S.J. Construction ultimately did not complete the entirety of the Weeks project, and that the surety bonds did not make RMHA, or various subcontractors, whole. (Docket Entry 188 at 17-35, 64-67, 75-77; *see also* Docket Entry 148 at ¶¶ 31-39.) The fact that some subcontractors may have sometimes received some payments prior to the RMHA terminating its agreement with S.J. Construction does not change the fact that Petitioner was involved in issuing fraudulent bond paperwork, nor does it change the fact that there were striking similarities between the VA bond scheme and the Weeks and Beal bond schemes. Moreover, the Court, at trial, expressed concerns about "getting too far afield in [the] Rocky Mount [Housing Authority projects]" and turning the presentation of the 404(b) evidence into another trial. (Docket Entry 186 at 233-236, 126, 224.) Consequently, it is unlikely the Court would have permitted further inquiries into the Weeks and Beal projects along the lines Petitioner now suggests, for fear of confusing the jury. And, as explained, had Petitioner taken the stand in his own defense on this (or any) issue at trial, it was more likely to have hurt his case than to have helped it. This argument, in all of its iterations, has no merit.[13]

---

[13] Petitioner asserts that evidence was presented to the Grand Jury that the Weeks project ultimately was backed by "an F.D.I.C. cash Certificate of Deposit made by [Petitioner] himself and that both Fondren and Lincoln escrow receipts had been rejected" but that at trial only "the rejected bonds . . . were submitted as evidence and given to the jury to consider." (Docket Entry 222 at 4.) Petitioner asserts that this "should have been questioned by defense counsel." (*Id.* at 5.) However, even assuming *arguendo* that Petitioner's assertion is true, it would warrant no relief. Petitioner was indicted for the Weeks surety bond scheme (Docket Entry 60, Count One) and, while that charge was ultimately dismissed (Minute Entry 12/19/2016), it would have been proper for the Grand Jury to consider all documents material to the Weeks project in the first instance. At trial, on the other hand, the Weeks and Beal projects were only considered in relation 404(b) evidence, and so it was proper to limit the scope of evidence presented to the jury to, for example, the materially false bond paperwork that Petitioner directed his proxies to prepare. There is no requirement that the same evidence be

29

Additionally, in light of the record in this case, the Court concludes that even if Petitioner had demonstrated attorney error in regards to the Weeks and Beal projects, which he has not, the error at trial would be harmless given the additional (and considerable) evidence of Petitioner's guilt. The evidence independent of the RMHA bond scheme was strong. The testimonies of Barela and Stephanie Green were mutually reinforcing, and their testimony was corroborated by the evidence showing that the Lyons brothers obtained payments from the VA that were designed for the legitimate workers on the parking deck project.[14]

Next, Petitioner faults counsel for failing to advise him that "question[s] about the pre-sentence report ("PSR") would be raised in [C]ourt" at sentencing, or that he would have an

_____

presented at trial that is presented to a grand jury. And, as explained above, both trial and appellate counsel objected to the introduction of this 404(b) evidence, however, those objections were overruled. Moreover, regardless of how much Petitioner asserts he paid subcontractors who worked on the Weeks project, the evidence was that RMHA ultimately suffered a loss. (Docket Entry 188 at 35-36, 56; Docket Entry 148 at 38-39.) Finally, Petitioner has failed to demonstrate with any meaningful likelihood that the bid bond in question was rejected by the RMHA. However, even if he had, this would not change the fact that the evidence indicates that Petitioner was involved in providing materially false bond paperwork in the first instance. Counsel was not ineffective here.

[14] Nor did the loss amount at sentencing ($326,591.55 of a total loss amount of approximately $4,030,000) attributed to Petitioner for the Weeks project impact his advisory guideline range. (Docket Entry 148, ¶¶ 39, 56; Docket Entry 191 at 60; Docket Entry 176 at 6.) Petitioner's 108 to 135 month advisory guideline range here was based upon a total offense level of 31 and a criminal history category of I. (Docket Entry 191 at 56-57, 105.) This included an eighteen-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) to his base offense level of seven because the loss was more than $3,500,000 but less than $9,500,000. (Docket Entry 148, ¶ 64.) Even excluding the Weeks loss amount from this calculation, the remaining loss amount would still be more than $3,500,000 but less than $9,500,000. Petitioner was sentenced to 120 months of imprisonment. (Docket Entry 191 at 57, 105; Docket Entry 176 at 2.) Therefore, even assuming the loss amount attributed to Petitioner for the Weeks project was erroneously attributed to him (something Petitioner has failed to demonstrate) there is no reason to believe it had any impact on the length of his sentence. Beyond this, Petitioner cannot challenge the restitution ordered in this proceeding. *See, e.g.*, *Krol v. United States*, No. 5:15-CR-292-FL-1, 2020 WL 1498876, at *6 (E.D.N.C. Jan. 23, 2020) ("In a § 2255 motion, a petitioner may only attack terms of incarceration, not fines, restitution orders, or forfeiture orders.") (collecting cases).

opportunity to speak at sentencing, and for failing to present to the Court at sentencing "a one-inch thick white binder . . . with letters of recommendation, and of character along with photos of his family." (Docket Entry 210 at pdf page 39.) However, even assuming counsel erred as alleged, Petitioner has failed to demonstrate any likelihood of prejudice as a result.

Petitioner also faults counsel for failing to challenge at sentencing the $215,000 loss from a subcontractor, Lewis Electric, reflected in the PSR. (Docket Entry 210 at pdf pages 40-43; Docket Entry 148, ¶¶ 55, 57, 114.) Petitioner contends that Lewis Electric suffered no loss. (Docket Entry 210 at pdf page 43.) Nevertheless, the Chief Executive Officer of Lewis Electric testified that it suffered a $215,000 loss, that it was not made whole by the work it did when it completed the VA project under a substitute contract, and that it also suffered reputational damage. (Docket Entry 186 at 78-79, 90; Docket Entry 191 at 19-21.) Petitioner has failed to demonstrate that, had counsel presented his alternative analysis, the result at sentencing was likely to have been different.[15]

Petitioner also faults counsel for failing to more vigorously challenge the testimony of Mark Hogan McCallum ("McCallum") at sentencing. (Docket Entry 210 at pdf page 54 referencing Docket Entry 191 at 66-91.) McCallum was the Chief Executive Officer of the National Association of Surety Bond Producers, a national trade association whose mission it was to advocate and educate for and about surety bonds. (Docket Entry 191 at 67.) This included collecting public information about companies or persons, including Petitioner and

---

[15] Additionally, while Petitioner's counsel did not challenge this loss amount at sentencing, counsel for his brother and co-conspirator did, and the objection was found to be without merit. (Docket Entry 191 at 28-30, 32.) This is an additional reason to conclude that any similar objection brought by Petitioner's counsel would likewise have been rejected.

his various aliases, that have histories of problems with fraud or improper sureties. (*Id.* at 69-71.) McCallum testified that he had previously testified and provided a written statement to a congressional subcommittee about surety fraud. (*Id.* at 74-75.) McCallum stated that Petitioner had a long history as both an individual and through various surety companies of issuing fraudulent bonds. (*Id.* at 75.) McCallum explained that, "From 2004 to 2010, the Montana Commissioner of Securities and Insurance fined Dennis Lyon $645,561 for supplying bid and performance bonds without a license and without verifiable assets to support those bonds." (*Id.*) McCallum explained further that "[i]n October 2012, Lyon was fined an additional 155,000 by the Montana Commissioner, which includes 148,000 in restitution for Fort Belknap Tribal construction on the Fort Belknap Indian Reservation for Lyon's unlicensed individual surety company, Native American Funds Management Services." (*Id.* at 75-76.) McCallum stated further that "[a] number of state insurance commissioners have issued cease and desist orders against Hanson [that is, Petitioner], including those in California, Connecticut, Florida, Georgia, Montana, Nevada, Ohio, Texas, and Washington. These orders, however, have not deterred Lyon/Hanson from continuing to issue worthless bonds by changing aliases and jurisdictions." (*Id.* at 76.)

Petitioner now faults counsel for not challenging McCallum's testimony more vigorously. For example, Petitioner now argues that "NAFMS should not have been fined $155,000 for issuing an individual surety bond and Movant should not have been charged $148,000 restitution" related to the Fort Belknap project. (Docket Entry 210 at pdf page 45.) Petitioner contends that "[i]t was counsel's job to formulate a strategy to defend Movant

32

against bogus allegations from Movant's major detractor, the Montana Insurance Commissioner." (*Id.* at 48.) In support of this theory, Petitioner has submitted numerous documents, as well as an extensive narrative, as to why the actions of the Montana Insurance Commissioner, and other entities, were purportedly improper. (*Id.* at 43-54.) Petitioner's allegation of ineffective assistance of counsel in this regard are unpersuasive. Petitioner has failed to demonstrate that it would have been tactically prudent for counsel to challenge McCallum along the lines he suggests in his supplement, that the documents Petitioner presented to counsel were likely to support these theories, or that counsel's failure to pursue these theories prejudiced him. Petitioner also ran the risk of receiving an obstruction enhancement if he took the stand at sentencing and testified falsely. This sub-ground has no merit in any of its iterations.

Petitioner next faults counsel for failing to challenge a number of purportedly false statements made at trial by RMHA executive director Russell and for failing to challenge Russell's credibility. (Docket Entry 210 at pdf pages 54-57.) Counsel, however, did cross-examine Russell (Docket Entry 188 at 35-51), and Petitioner has failed to demonstrate that this cross-examination was objectively unreasonable. Petitioner has also failed to demonstrate that the failure to challenge Russell along the additional lines now proposed somehow prejudiced him. Moreover, Petitioner's assertion that further cross-examination would have benefited him in the eyes of the jury is entirely speculative and Petitioner has failed to demonstrate either element of ineffective assistance of counsel as to this sub-claim.

Finally, Petitioner asserts that trial and appellate counsel failed to properly communicate with him, failed to raise certain arguments in the appeal, and failed to provide him with copies of the appeal and other documents. (Docket Entry 207 at pdf pages 50-51.) However, even assuming this is true, Petitioner—who, as discussed herein, has failed to identify any potentially meritorious objection or claim that could have been raised at trial or on appeal—has failed to demonstrate that he was prejudiced as a result. His first ground for relief lacks merit and should therefore be denied.

## Ground Two

Petitioner next asserts "[p]rosecutorial misconduct based on prosecutor's failure to turn over exculpatory evidence and the prosecutor's deliberate use of invalid and erroneous evidence designed to confuse and deceive the jury." (Docket Entry 207, Ground Two.) As explained below, these arguments have no merit.

"When asserting a prosecutorial misconduct claim, a defendant bears the burden of showing (1) that the prosecutors engaged in improper conduct, and (2) that such conduct prejudiced the defendant's substantial rights so as to deny the defendant a fair trial." *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2005). Here, Petitioner contends, without support, that "The Government obtained emails between Green and Barela that showed Movant had no involvement in the VA project. These emails would have exonerated Movant and are thus exculpatory." (Docket Entry 207 at pdf page 45.) Petitioner contends further that "The prosecution also withheld emails from Bustos, Hilliard and the VA, which would have proved that Movant was not involved in the VA project. The Government did not use *any* email

34

correspondence in the trial relating to movant." (*Id.*) Nevertheless, Petitioner fails to describe the specific details or contents of these emails, how he learned that the Government withheld them, and how they specifically exonerate him. *See Nickerson*, 971 F.2d at 1136.

Petitioner is also mistaken when he asserts that the Government did not use any email correspondence in the trial relating to him. As explained above, the Government introduced email correspondence between Barela and Petitioner regarding the provision of surety bonds to support S.J. Construction's bid for the VA parking deck project. In one email, Petitioner directed Barela to consult with his brother Frank about issuing a new bid bond after the VA rejected a prior bid bond. (Docket Entry 186 at 185.) In a second email, Petitioner reassured Barela that she would receive a "bigger portion of the S.J. check." (*Id.* at 209.) Contrary to Petitioner's claim, the Government did present email correspondence relating to Petitioner and it was incriminating as such email evidence showed Petitioner's direction of Barela and his control of the funds obtained from the VA.

Petitioner next challenges the introduction of evidence of the surety bond scheme involving the RMHA. He asserts that this evidence was introduced by the Government to "intentionally confuse the jury" and that the Court erred in allowing the admission of this evidence under Rule 404(b).[16] (Docket Entry 207 at pdf pages 45-48.) Petitioner's claims that the prosecution maliciously misconstrued the innocent nature of the RMHA surety bonds is not persuasive. This is essentially a reiteration of one of Petitioner's ineffective assistance of

---

[16] Petitioner also repeats his argument that he properly supported the Weeks project financially (Docket Entry 207 at pdf pages 47-48), however, that arguments fails for reasons set forth elsewhere in this Recommendation.

counsel claims already discussed above, and this new iteration fails for essentially the same reasons already discussed. In short, Petitioner ignores the evidence presented to the jury, described in detail above. The bond paperwork issued at Petitioner's direction in regard to the Rocky Mount projects of S.J. Construction was false like the bond paperwork issued at Petitioner's direction for S.J. Construction's VA project. The issue is not whether the project was legitimate. The issue was whether the bond paperwork provided by Petitioner to allow S.J. Construction to obtain the project and upon which the RMHA relied was legitimate. The trial evidence established that it was not. And, in light of the record in this case, even if Petitioner had demonstrated prosecutorial error in regards to the Weeks and Beal projects (which he has not) the error would be harmless given the additional (and considerable) evidence of Petitioner's guilt in this matter. This argument has no merit and should be rejected.

## <u>Ground Three</u>

Petitioner next asserts "[i]neffective assistance of counsel for failing to object to the multitude of errors in the pre-sentence report." (Docket Entry 207, Ground Three.) However, as explained below, this argument lacks merit.

Specifically, citing the PSR, Petitioner faults counsel for not objecting to the inclusion of "the Beale Street RMHA project . . . in the loss calculation" at sentencing because he had no involvement in this project. (*Id.* at pdf pages 48-49.) Nevertheless, it appears Petitioner was held responsible for a loss related to the Weeks project, not the Beal project. (*See* Docket Entry 148, ¶¶ 39, 28-38; Docket Entry 191 at 56-61 (adopting PSR in pertinent part).) And, beyond that, as explained in detail earlier, the evidence at trial indicates that Petitioner *was* involved in

36

securing the Beal project through the issuance of fraudulent bond paperwork. Consequently, even if some portion of the loss to RMHA were related to the Beal Street project (Docket Entry 148, ¶¶ 38-39), and was attributed to Petitioner (which does not appear to be the case), that would not be improper.

Petitioner also asserts that the PSR wrongly states that he "was an owner of Fondren and FMS LLC," but that testimony at trial indicated that these businesses were, respectively, owned by Green and Bustos.[17] (Docket Entry 207 at pdf page 49.) However, Petitioner is wrong here for a number of reasons. First, Petitioner is apparently referencing a statement in his PSR which does not describe him as an "owner" of either business, but instead states that:

> Fondren International Inc. was a corporation organized under the law of the State of Nevada, and purported to be a financial institution issuing escrow receipts to secure construction bonds executed by individuals serving as sureties on construction projects. An individual with the initials C.G. was the President of Fondren International, Inc., and Dennis Joe Lyon was a Vice-President and authorized officer of Fondren International, Inc. Funds Management Service, LLC (FMS) was a corporation organized under the laws of the State of New Mexico, and its office and place of business was in Albuquerque, NM.

(Docket Entry 148, ¶ 26.) Second, at trial, Bustos testified that even though his name was on the paperwork, Petitioner directed Funds Management Services. (Docket Entry 188 at 109-110, 117.) Third, Stephanie Green—who at the time was a 28-year-old nursing student—did not testify that she "owned" Fondren, but instead stated that she worked for it while her father

---

[17] Later in this same pleading, Petitioner contests the statement in the PSR that he was "a vice president and authorized officer of Fondren International Inc." (Docket Entry 210 at pdf page 38.) However, this argument also fails, if for no other reason than for a lack of prejudice.

went to prison for racketeering. (Docket Entry 187 at 138-142, 155-56.) Stephanie Green testified that Petitioner was her father's business associate and that he told her that "he still owed" her father and that "our business relationship's going to continue." (*Id.* at 145-46.) Thereafter Green signed escrow receipts for Petitioner and his brother, including the unsupported VA escrow receipt. (*Id.* at 147-155.) Fourth, even assuming that Petitioner was not an officer or the Vice President of Fondren, there is no reason to believe that he was prejudiced as a result of this statement in his PSR. This ground also lacks merit.

### Motion for Release from Custody

In this motion (Docket Entry 214), Petitioner seeks immediate release from imprisonment while the Court considers his grounds for relief, makes additional argumentation in support of these grounds, and requests an evidentiary hearing.[18] Even assuming the Court had the authority to grant such release, it would not do so here. All Petitioner's grounds for relief are without merit and nothing in this motion (Docket Entry 214) suggests otherwise. Given that Petitioner's grounds all fail as a matter of law, an evidentiary hearing is unnecessary and will also be denied.

---

[18] Petitioner also challenges his enhancement under the advisory guidelines based upon his leadership role in the crimes. (Docket Entry 214 at 2.) Petitioner raised this issue on appeal and it was found to be without merit. *Lyon*, 751 Fed. App'x at 363. He cannot raise this issue again here, *Boeckenhaupt*, 537 F.2d at 1183, and, even if he could, the Court would deny it for the same reasons as the Fourth Circuit. Likewise, any effort to recast this ground as one for ineffective assistance of counsel is also unpersuasive for all of the reasons set forth above. Petitioner also asserts that he "'is over 60 years old and is eligible for early release to home confinement under the First Step Act provided he has served two thirds of his sentence. If Petitioner was resentenced to 48 months or less, then he would be immediately eligible for release to home confinement." (Docket Entry 214 at 2.) This argument is unpersuasive, if for no other reason than Petitioner is not entitled to resentencing for all of the reasons set forth herein.

## Motion to Appoint Attorney

Petitioner next requests the appointment of an attorney and provides additional argumentation in support of his grounds for relief. (Docket Entry 217.) As explained herein, all of Petitioner's grounds for relief are without merit. In light of this, Petitioner has failed to set forth good cause for the appointment of counsel, nor would it be in the interest of justice to appoint counsel under these circumstances. This motion should be denied.

## "Motion in Anticipatory Resistance"

Petitioner has also filed a motion requesting that the Court deny any future efforts by the Government to secure an extension of time to respond to Petitioner's § 2255 motion. (Docket Entry 218.) However, the Government has already filed its response (Docket Entry 219) and Petitioner's motion is therefore moot and will be denied as such.

## Conclusion

For all these reasons, Petitioner's grounds for relief have no merit. Neither discovery, nor the appointment of counsel, nor an evidentiary hearing are warranted here.

**IT IS THEREFORE RECOMMENDED** that Petitioner's motion to supplement (Docket Entry 210) be **GRANTED** and that Petitioner's motion for release from custody (Docket Entry 214), motion for the appointment of counsel (Docket Entry 217), and motion in anticipatory resistance (Docket Entry 218) all be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Petitioner's motion to vacate, set aside or correct sentence (Docket Entry 207), as supplemented, be **DENIED** and that this action be **DISMISSED**.

_____
Joe L. Webster
United States Magistrate Judge

June 15, 2020
Durham, North Carolina